303 So.2d 795 (1974)
Richard McBRIDE, Plaintiff-Appellee,
v.
William LYLES, Administrator of the Estate of Robert G. Lyles, a minor, et al., Defendants-Appellants.
No. 4776.
Court of Appeal of Louisiana, Third Circuit.
November 27, 1974.
*796 Brittain & Williams by Jack O. Brittain, Natchitoches, Polk, Foote, Randolph & Percy by William P. Polk, Alexandria, for defendants-appellants.
Gerard F. Thomas, Jr., Natchitoches, for plaintiff-appellee.
Before FRUGÉ MILLER and DOMENGEAUX, JJ.
FRUGÉ, Judge.
The plaintiff, Richard L. McBride, brought this action against defendants, William Lyles, Robert G. Lyles, Paul Halbert, Otto S. Halbert, Thomas H. Litton, David R. Sanders, Stephen L. Bailey, Louisiana Farm Bureau Mutual Insurance Company, and Southern Farm Bureau Casualty Insurance Company for injuries sustained by the plaintiff in a fight which he had with some of the defendants. The trial court found that the defendants had acted jointly and actively participated in the beating of the plaintiff, and held all the defendants, except Southern Farm, liable in solido. We affirm.
This case involves a fist fight which occurred on March 4, 1973, at Northwestern State University Prather Coliseum. The plaintiff was a 21 year old college student at the university and the defendants, Robert G. Lyles, Otto S. Halbert, Thomas Litton, David Sanders, and Stephen Bailey, were students at Rapides High School, who were attending a high school basketball game at the university.
The testimony of the witnesses who saw the fight is in conflict, and the trial judge made the following determination of fact. The plaintiff was attending the ball game with a date and was with Bruce Primm and his date. Primm had had words and had exchanged obscene gestures with some of the teenage defendants two or three nights previous to the March 4 ball game. On the date of the fight, the plaintiff observed Primm again exchanging obscene gestures and comments with one of the defendants. This happened while Primm was approaching the seat which the plaintiff had reserved for him in the seating area of the coliseum. Primm and one of the defendants, Robert Lyles, invited each other down to the concourse underneath the seating area to "have it out." As Primm and Lyles left the seating area to go downstairs, four of Lyles' friends followed, so there were five young men from Rapides High School going down with Primm. Observing this the plaintiff left his seat and walked down the stairs to see what was going on. While he was descending the stairs, and unknown to him at that time, Primm had slugged Lyles knocking him down and evidently ending the fight between Primm and Lyles. Lyles got up from the floor and was in the process of shaking hands with Primm when the plaintiff walked up to the group.
The trial judge accepted completely the testimony of Joffree Brooks, a 30 year old psychology major from the university who had observed the altercation. He was not *797 related to anyone involved in the matter and was found by the trial judge to be entirely disinterested in the matter. Brooks testified that the plaintiff had been held down on the floor by at least three of the defendants, with the plaintiff receiving multiple blows and at least one kick in his face. Brooks identified the five defendants to the Northwestern Campus Security officers, who immediately arrived at the scene of the altercation and who made a report of the incident and listed the names and addresses of the five defendants. The court also accepted the testimony of Officer Bryan Perot, one of the Campus Security officers who arrived at the scene of the fight just as it was ending. He stated that he found the plaintiff doubled up in pain on the floor, and identified the five defendants as the persons who had been in the fight. He further stated that all five of the defendants showed some signs of being in the altercation, some having their clothing torn and others having blood on their clothing. He also stated that all five of the defendants were very belligerent when he first arrived and would not stop fighting until they were threatened with his night stick.
All five of the defendants testified that only one person, Otto Halbert, fought with the plaintiff. But the court rejected the testimony of these five defendants in this regard. The court found that while three of the defendants actually beat and kicked the plaintiff as he was on the floor, the other two assisted in the beating by preventing Primm from going to the aid of the plaintiff in an attempt to minimize the injuries being received by him. The court found as a matter of fact that the plaintiff had done nothing to start the fight, had not threatened anyone, had not attempted to strike any of the defendants, and made no demonstration of hostility or anger prior to his being beaten.
After the altercation, the plaintiff was taken to the Natchitoches Parish Hospital where he was given emergency treatment. A laceration over his left eye was sutured in the emergency room at the hospital, but because of the multiple fractures of the nose, septum, the bone just under the right eye, and a fracture of maxillary sinus on the right, the doctor in Natchitoches sent plaintiff to Cabrini Hospital in Alexandria where he was immediately admitted under the care of Dr. James Tate. The plaintiff remained in the hospital from March 4 to March 8. Corrective surgery was performed by Dr. Tate, but the plaintiff remained disfigured with a crooked nose which, the court stated, was obviously noticeable. Dr. Tate had recommended additional surgery to correct the deviated nose. The court found that the plaintiff had suffered severe pain and that his face had been broken in several places. He had received damage to the tear duct of one eye, and missed six days of school, and was still experiencing breathing difficulties at the time of the trial, approximately one and one-half years after the injury.
The court awarded the plaintiff $8,000 for his pain and suffering, and $1,237.85 special damages.
The defendants argue on appeal that the plaintiff assumed the risk of being injured in a fight by leaving a position of safety and placing himself in a position of peril. Article 1005 of the Code of Civil Procedure requires that this affirmative defense be set forth in the answer. See also Trahan v. Nunez, 256 So.2d 150 (La. App. 3d Cir. 1972). This requirement was not met in the present case, nor were any facts constituting this affirmative defense alleged in the answers filed by the defendants. Under the circumstances we cannot consider this defense.
The defendants next argue that Primm and the plaintiff were acting jointly and that the aggression of Primm should be imputed to the plaintiff. As an aggressor the plaintiff would not be able to recover. However, the very analysis used by the defendants negates this argument. Their analysis separates the encounter between Primm and Lyles from that between *798 the plaintiff and the other defendants. This analysis demonstrates that actually two fights, not one, took place. This is in line with the conclusion reached by the trial judge, for he found that by the time the plaintiff arrived at the scene of the fight between Primm and Lyles, the fight was over and Lyles was in the process of shaking hands with Primm. The aggression of Primm ended before the plaintiff arrived. The next act of aggression was the blow which struck the plaintiff, and which was delivered by Otto Halbert. That act of aggression began the second fight. Any aggression on the part of Primm in the first fight cannot be imputed to the plaintiff who was not present, according to the findings of the trial court, and who did not even know that a fight had taken place between Primm and Lyles until after it had ended.
The defendant Louisiana Farm Bureau argues that if the defendants Robert G. Lyles and Otto S. Halbert are found liable to the plaintiff for intentionally inflicting injury on him, there can be no coverage under the insurance policies issued to their fathers. The argument is that the sons are included as persons insured under the definitions section contained within the personal liability provisions of the two policies. The policies exclude coverage of "bodily injury or property damage which is either expected or intended from the standpoint of the Insured." Since the injuries to the plaintiff were intentionally inflicted by the insureds, there can be no coverage.
This is a proper analysis of the exclusion and its application to Robert Lyles and Otto Halbert. However, Louisiana Farm Bureau argues that because the injuries suffered by the plaintiff were intentionally inflicted, there can be no coverage for the vicarious liability imposed on the boys' fathers, William Lyles and Paul E. Halbert, by operation of law. Hurston v. Dufor, 292 So.2d 733 (La.App. 1st Cir. 1974) and Swanson v. Comeaux, 296 So.2d 267 (La.1974) are cited as authority for this contention.
We are of the opinion that these cases do not support the contention of Louisiana Farm Bureau. In Hurston the minor son of one of the defendants was allegedly negligent in his operation of an automobile. The plaintiffs argued that recovery could be had under the provisions of a home owner's policy issued to the mother. The court held that there was no coverage in view of the fact that the policy excluded coverage of personal liability arising out of the ownership, maintenance, operation, use, loading or unloading of automobiles. The court had the following to say:
"It is argued that because Mrs. Weaver's liability is vicarious, it does not arise from her operation of an automobile, therefore, her liability does not arise from an act covered by the exclusionary clause and the exclusionary provision is inapplicable.
We find the construction urged by plaintiffs-appellants to be unreasonable considering the basic nature of the homeowners policy which appears in evidence. To hold as these parties suggest would extend coverage far beyond what appears the reasonable intention of insured and insurer. It appears the exclusionary clause in question was designed to exclude liability arising in any manner from the operation or use of an automobile away from the premises of the insured. To hold otherwise is to create an automobile insurance contract out of a homeowners policy designed primarily to cover liability resulting from incidents occurring on the premises of the insured." 292 So.2d at 739.
The court looked to the basic purpose of the home owner's policy and to what it was designed to cover. It was not designed to cover what properly should be covered by automobile insurance. The parties never contemplated that such a policy would cover liability arising out of the operation of an automobile.
The language used in the policy in Hurston dealt generally with any use, operation, *799 or ownership of automobiles. Whether the liability be vicarious or otherwise, the language excludes coverage. The language of the exclusion in the present case dealt with the narrow area of damages or injuries "expected or intended from the standpoint of the Insured" only, not any expected or intended damages or injuries. (Emphasis added.) There can be no application of the Hurston decision to the present set of facts.
The decision in Swanson is likewise inapplicable. That case involved an interpretation of the coverage provisions of an automobile insurance policy and the applicability of the proviso requiring the insured to have the permission of the owner for there to be coverage of an automobile which is owned by someone other than the insured. The Supreme Court concluded that coverage for the named insured, whether liability is vicarious or otherwise, is predicated on the named insured having permission to operate the non-owned automobile. That holding has no application to the present factual situation.
The decisions in Rivers v. Brown, 168 So.2d 400 (La.App. 3d Cir. 1964) and Baltzar v. Williams, 254 So.2d 470 (La.App. 3d Cir. 1971) are more relevant to the set of facts with which we are presented. In Rivers the plaintiff alleged that he was pistol whipped and kicked by the defendant, L. T. Brown, who was acting as an agent of the defendant L. T. Brown Contractor, Inc. At issue was whether the liability insurance carried by the company covered the damages resulting from the attack by the company's agent. The policy covered assaults and batteries "unless committed by or at the direction of the insured." The insurer argued that since L. T. Brown was the president, principal stockholder and superintendent of construction for L. T. Brown Contractor, Inc., any assault and battery committed by Brown was necessarily committed "by or at the direction of the insured," and therefore was excluded from coverage. The court gave the following reason for rejecting this contention:
"whether the named insured was a corporation or an individual, the named insured is still legally responsible for the torts of its agents or employees in the course of employment. To exclude assaults committed by or at the direction of an employee would mean that the named insured would be left without any coverage for such acts by its employees. Such an interpretation would defeat the very purpose for which the named insured purchased the insurance, i. e., to protect itself against such wrongful acts by its employees. The only assaults excluded are those committed by or at the direction of the named insured. The assault and battery in this case was committed by L. T. Brown individually, while acting as an agent or employee of the insured corporation and was not committed or directed to be committed by the corporation as such." 168 So.2d at 401-402.
In Baltzar the plaintiff was allegedly injured during an illegal arrest by a deputy town marshal for the town of Glenmora. The issue was whether the liability policy issued to the town excluded coverage of intentional wrongful acts committed by employees of the town. The policy excluded from coverage "bodily injury or property damage ... expected nor intended from the standpoint of the insured." The court looked to the incident from the standpoint of the named insured, i. e., the town, in order to determine whether the injury was intended or expected, and held that it was not intended or expected by the town that its deputy would commit an intentional, violent act upon a citizen; therefore, coverage was available.
No person can insure against his own intentional acts. Public policy forbids it. Baltzar v. Williams, supra. But public policy does not forbid one to insure against the intentional acts of another for which he may be vicariously liable.
*800 In the present case the issue is whether there is insurance coverage for the fathers of two of the five boys who intentionally injured the plaintiff. The fathers are the insureds for purposes of this analysis. The injuries suffered by the plaintiff were not intended or expected from the standpoint of the insureds. Therefore, the exclusion does not apply, and the policies issued by Louisiana Farm Bureau to the defendants William Lyles and Paul E. Halbert cover the injuries which are the subject of this action.
The remaining arguments made by the defendants call for an evaluation of the findings of facts made by the trial judge. His findings will not be disturbed as we find no manifest error.
We note that the defendant Southern Farm Bureau Casualty Insurance Company was not mentioned in the judgment of the trial court. The issue of this defendant's liability is not before us. The plaintiff-appellee did not raise this issue in an appeal of his own. Nor did the other defendants-appellants raise this issue in their appeal.
For the reasons assigned, the judgment of the trial judge is affirmed at defendants-appellants' costs.
Affirmed.
MILLER, J., concurs in part and dissents in part and assigns written reasons.
MILLER, Judge (dissenting in part).
While failing to find manifest error as to three defendants and their insurer, I respectfully submit that defendants David Randel Sanders and Thomas Henry Litton were improperly cast in judgment.
The trial court cast these two defendants because they "assisted in the beating by preventing Bruce Primm from going to the aid of the plaintiff in an attempt to minimize the injuries being received by the plaintiff." Tr. 25, 26.
This fight started when plaintiff's friend Primm invited one of Lyles' friends down to fight. Tr. 117 line 12. Primm promptly beat one of Lyles' friends and invited the others to the same treatment. When several accepted, plaintiff objected and both plaintiff and Primm were fighting from that moment until the security police were on their way.
Plaintiff went to the fight area to help Primm if necessary. Tr. 105 lines 7-9. As plaintiff walked up, he saw Primm strike the last blow of what the majority finds to be the first fight. Tr. 105 lines 24, 25. When plaintiff told Lyles' friends that they couldn't all jump on Primm at the same time, plaintiff was immediately struck. Tr. 105 et seq.
Primm testified (as did defendants whose testimony was rejected by the trial court) that Primm went over and kicked Halbert in the mouth (Tr. 156, 7) while Halbert and plaintiff were fighting on the floor. It was at that stage when defendants Sanders and Litton restrained Primm.
Primm also testified that he was kicking (Sanders and Litton). Tr. 119 lines 17, 8. When the officers arrived, Primm was being held around the neck, "like in a headlock." Tr. 81 line 10 et seq.
I cannot agree that Sanders and Litton are liable for plaintiff's damages. They had every right to attempt to restrain Primm (who all agree was the original aggressor) from continuing to kick into the melee.
I respectfully dissent.